

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

17 MAY 30 AM 11:41

| LMV-AL VENTURES, LLC d/b/a The Harbor at Lakeway, | |
|---|---|
| Plaintiff, | |
| -vs- | Case No. A-17-CA-272-SS |
| LAKEWAY OVERLOOK, LLC and LAKEWAY TOWNLINE, LLC, | |
| Defendants. | |

## ORDER

BE IT REMEMBERED on the 31st day of March 2017, the Court held a hearing in the above-styled cause, and the parties appeared in person or through counsel. Before the Court are Plaintiff LMV-AL Ventures, LLC d/b/a The Harbor at Lakeway (Harbor)'s Motion for a Temporary Restraining Order and Preliminary Injunction [#2]; Defendants Lakeway Overlook, LLC and Lakeway Townline, LLC (collectively, Lakeway)'s Response [#7], Brief [#8], and Supplemental Brief [#16] in opposition; Harbor's Supplemental Brief [#17] and Reply [#18] in support; Harbor's Motion for Leave to Conduct Expedited Discovery [#3]; and finally Harbor's Motion to Compel [#11], Lakeway's Response [#12] in opposition, and Harbor's Supplement [#15] in support. Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

This case concerns whether Lakeway's facility, purported to be an independent living facility, actually constitutes an assisted living facility thereby violating a deed restriction that favors Harbor (the Use Restriction). The parties' dispute turns on subtle distinctions in the spectrum of types of care available for the elderly. The parties agree an independent living facility is generally not an assisted living facility. But where, in the spectrum of care types, the classification "independent living facility"



ends and the classification "assisted living facility" begins is ill-defined. Fortunately, the Court need not determine whether Lakeway's facility is an assisted living facility today as the only issue currently before the Court is whether to grant preliminary injunctive relief.

Based on the evidence before the Court at this time, Harbor has not established a substantial likelihood of success on the merits. There is insufficient evidence for the Court to conclude Lakeway is likely marketing or preparing to operate an assisted living facility in violation of the Use Restriction. Therefore, because Harbor has not met its burden of proof, the Court DENIES Harbor's motion for a preliminary injunction. Additionally, in light of the denial of preliminary injunctive relief, the Court DISMISSES Harbor's motion for leave to conduct expedited discovery and motion to compel.

## Background

### I. The Parties

#### A. Harbor

Harbor is an assisted living facility licensed by the State of Texas and operating in Lakeway Regional Medical Center Condominium (Medical Center). Formed in 2010, the Medical Center is overseen by the Lakeway Medical Center Condominium Association (the Association) and governed by the Declaration of Condominium Regime for Lakeway Regional Medical Center (Condominium Declaration). *See* Compl. [#1-1] Ex. A (Condominium Declaration).

Harbor purchased Unit 4, a condominium plat, of the Medical Center in 2012. Defs.' Suppl. Br. [#16-4] Ex. C (Timeline) at 1. As part of its purchase of Unit 4, Harbor bargained for and obtained the Use Restriction, a deed restriction on the Medical Center's other plats. The Use Restriction specifies that property other than Harbor's "may not be used, operated, or marketed as an Assisted Living Facility (as that term is defined in the Condominium Declaration) or a Memory Care Facility. For avoidance of doubt, the term 'Assisted Living Facility' shall include facilities furnishing services

to either a Type A or Type B assisted living facility as such terms are defined in Rule 92.3 of the <u>Texas Administrative Code</u>, Title 40, Part I, Chapter 92." Compl. [#1-2] Ex B (Use Restriction) at 1. With a term of twenty years, the Use Restriction runs with the land, benefits all future owners of the Harbor, and binds all future owners of the restricted property. *Id.* at 1–2.

The Condominium Declaration defines Assisted Living Facility to mean:

> a facility that: (i) furnishes, in one or more buildings, food and shelter to long-term residents of such building(s) and (ii) is licensed as an Assisted Living Facility, if required under applicable state or federal law and regulations, and provides Personal Care Services (as hereinafter defined) to its residents.

Condominium Declaration at 19. The Condominium Declaration subsequently defines personal care services to mean:

> (i) assistance with meals, dressing, movement, bathing or other personal needs or maintenance to the residents; (ii) the administration of medication by a person licensed to administer medication or the assistance with or supervision of medication to the residents; or (iii) general supervision or oversight of the physical and mental well being of the residents who need assistance to manage the person's personal life regardless of whether a guardian has been appointed.

*Id.* Read together, the Condominium Declaration and Use Restriction prohibit a property within the Medical Center, other than the property owned by Harbor, from being used, operated, or marketed as an assisted living facility as it is defined in the Condominium Declaration.

**B. Lakeway**

In January 2013, the Condominium Declaration was amended to create Unit 2, which was designated as the Independent Living Unit (January 2013 Amendment). Defs.' Suppl. Br. [#16-15] Ex. N (Jan. 2013 Amendment) at 1. As Harbor is a member of the Association, Harbor's manager signed the January 2013 Amendment. *Id.* at 4.[1]

---

[1] The Association amended the Condominium Declaration again on September 4, 2013 to annex additional property into the Condominium Declaration, including units designated as the Rehabilitation Unit and Skilled Nursing

-3-

Over a year later, on November 4, 2014, Lakeway purchased Unit 2. Timeline at 1. In July 2015, Lakeway began construction of its independent living facility, Lake Travis Independent Living (LTIL). *Id.* Lakeway intends to begin operating LTIL in June or July 2017. Defs.' Br. [#8] at 4.

In preparation for opening LTIL, Lakeway hired Spectrum Retirement Communities (Spectrum) to serve as its agent and the operator of LTIL. *Id.* at 5. Spectrum owns and manages a variety of independent living, assisted living, and memory care facilities throughout the country. *Id.*

At LTIL and through Spectrum, Lakeway plans to offer housing for individuals who are fifty-five years or older. *Id.* at 4. Lakeway also intends to equip LTIL with shared amenities such as a restaurant, organized group activities, a salon and day spa, a concierge service, and a wellness center housing a gym and fitness classes. *Id.* Lakeway has not been licensed by the State of Texas as an assisted living facility. *Id.*; Mot. Prelim. Inj. [#2] at 11.

Although Lakeway has not yet begun operating, it expects to have each resident sign a Residency Agreement. Defs.' Suppl. Br. [#16] at 5. The Residency Agreement expressly informs residents that LTIL—referred to as the Community in the Residency Agreement—"does not provide staff to care for residents of the Community's independent living units." *Id.* [#16-11] Ex. J (Residency Agreement) at 4. The Residency Agreement reminds residents they "may obtain health care and personal care from outside service providers . . . ." *Id.* Moreover, the Residency Agreement emphasizes "[t]he Community does not supervise the activities of residents of the independent living units. . . . [and] is not licensed to provide and will not provide the Resident with assisted living services or skilled nursing services of any kind (including but not limited to, assistance with the tasks of daily

---

Unit. Mot. Prelim. Inj. [#2-12] Ex. L (Sept. 2013 Amendment) at 2.

-4-

living; the services of private duty aides, physicians, and nurses; medications; and items and services for which a license is required)." *Id.* at 6.

Additionally, Lakeway intends to pre-screen various healthcare and in-home care providers to ensure they are licensed and have proper insurance. *See* Defs.' Br. [#8] at 5. Lakeway plans to give residents the pre-screened providers list upon request but will not require residents to choose a provider from that list. *Id.* Certain third-party services, such as physical therapy or occupational therapy, may choose to perform their services in LTIL's wellness center, but future residents must contract separately for any such services. *Id.*

In advance of LTIL's opening, Lakeway has been marketing the facility. LTIL's webpage previously proclaimed:

> In-home care providers can come to your apartment when you need some extra assistance. Just contract with them separately for help with personal care, medication, health screenings and more—so you can maintain your independent lifestyle at Lake Travis Independent Living for as long as possible.*
>
> *These providers are independent contractors and not legally related to or owned by Lake Travis Independent Living or Spectrum Retirement Communities, LLC [Lakeway's manager/operator].*

*Id.* at 4.[2]

## II. Texas Law

Texas's statutory framework provides important context. Texas law requires all assisted living facilities operating in Texas to be licensed. *See* TEX. HEALTH & SAFETY CODE § 247.021(a). A person establishing or operating a facility not licensed as an assisted living facility cannot use the term "assisted living" in referring to the facility or the services provided at the facility. *Id.* § 247.021(b).

---

[2] Lakeway altered LTIL's website as a result of events immediately proceeding this lawsuit. Defs.' Suppl. Br. [#16-8] Ex. G (Olson Dep.) at 56:18–57:8.

However, "[a] person establishing or operating a facility that is not required to be licensed but who elects to obtain a license under this chapter may use the term 'assisted living' in referring to the facility or the services provided at the facility." *Id.* § 247.021(c).

Furthermore, Texas law defines assisted living facility to mean an establishment that:

(A) furnishes, in one or more facilities, food and shelter to four or more persons who are unrelated to the proprietor of the establishment;

(B) provides:

(i) personal care services; or

(ii) administration of medication by a person licensed or otherwise authorized in this state to administer the medication; and

(C) may provide assistance with or supervision of the administration of medication.

*Id.* § 247.002(1) (amended 2011).[3] Personal care services are defined as:

(A) assistance with feeding, dressing, moving, bathing, or other personal needs or maintenance; or

(B) general supervision or oversight of the physical and mental well-being of a person who needs assistance to maintain a private and independent residence in an assisted living facility or who needs assistance to manage the person's personal life, regardless of whether a guardian has been appointed for the person.

*Id.* § 247.002(5).

Texas law does not require an independent living facility to have a special license. Defs.' Br. [#8] at 4.

### III. The Dispute

In January 2017, the executive director of LTIL, a Spectrum employee, selected Capitol Home Health (Capitol) as the preferred home health provider for LTIL. Timeline at 2; Defs.' Suppl. Br. [#16-

---

[3] The statutory definition has been amended to include other services an assisted living facility may provide, but those additions are not relevant here. *See* TEX. HEALTH & SAFETY CODE § 247.002(1).

4] Ex. D (Patterson Aff.) at 3. The executive director intended to lease Capitol space onsite at LTIL. Patterson Aff. at 4.

On February 24, 2017, Harbor sent Lakeway a letter, which demanded Lakeway cease operating or marketing LTIL as an assisted living facility as defined in the Condominium Declaration. Mot. Prelim. Inj. [#2-5] Ex. E (Notice Letter). On March 10, 2017, Lakeway responded, denying LTIL was operating or being marketed as an assisted living facility. *Id.* [#2-6] Ex. F (Response Letter).

On March 9, 2017, a private investigator employed by Harbor posed as an individual looking for a residence for his elderly relative. *Id.* [#2-4] Exs. D-1 (Meeting Tr.), D-2 (Prado Decl.). While wearing a recording device, the private investigator met with Paige Parker (Ms. Parker), a sales representative for LTIL. *See* Defs.' Suppl. Br. [#16-7] Ex. F (Olson Aff.) at 2. An employee of Spectrum, Ms. Parker had been trained in Colorado and worked as a sales representative for LTIL for two days before the recorded meeting with the private investigator. *See id.* [#16-6] Ex. E (Parker Aff.) at 1 (stating she began working for LTIL on March 7, 2017).

During the meeting, Ms. Parker described some of the amenities and services LTIL expected to offer. She explained that LTIL intended to offer three meals a day for residents prepared by an onsite chef, housekeeping, and transportation services. Meeting Tr. at 6:21–28, 13:27–32. Ms. Parker also described how LTIL features 140 apartments with a variety of floor plans. Meeting Tr. at 12:12–13:25. Ms. Parker stated Capitol would be renting space inside LTIL and could provide care such as bathing assistance an elderly resident might need. *Id.* at 5:6–17. She indicated personnel would staff the concierge desk twenty-four hours a day and residents would be given a pendant to call for assistance. *Id.* at 6:32–7:3.

Ms. Parker also explained the difference between LTIL and an assisted living facility. According to Ms. Parker, "with[] assist[ed] living you're paying a little bit more money but you're also

getting care givers that are there on site, uh, all hours of the day. . . . and you kind of pay for, the different services that you need. Some medication reminders, bathing and stuff like that. Uh, our community is an independent living. . . . so the residents that live there are pretty much independent. We don't provide caregivers to help do these things all the time." *Id.* at 4:33–5:4. Ms. Parker further described how a resident may later need to move to a place that "can give her more care or an assisted living [facility]" when she needs more help. *Id.* at 8:1–8.

Sometime between February 22, 2017, and March 27, 2017, Spectrum informed LTIL's executive director LTIL would not be leasing space to Capitol and LTIL would not designate a preferred home health provider. Patterson Aff. at 4. LTIL's executive director subsequently informed Capitol of the change. *Id.* On March 27, 2017, Lakeway notified Harbor LTIL would not feature any third-party care providers onsite. Mot. Prelim. Inj. [#2-7] Ex. G (Mar. 27, 2017 Email).

Harbor filed this suit on March 30, 2017, alleging a violation of the Use Restriction and seeking declaratory and injunctive relief. Compl. [#1]. Harbor immediately moved for a temporary restraining order and a preliminary injunction. Mot. Prelim. Inj. [#2]. In its request for relief, Harbor asks this Court to enjoin Lakeway from marketing or preparing to provide assistance with personal care services, operating a restaurant on-site, and leasing space to home health providers. *Id.* at 18–19. On March 31, 2017, this Court held a hearing, entertaining argument from both parties to gain an initial understanding of the facts of the case. Postponing ruling on Harbor's motion for preliminary injunctive relief, the Court authorized limited discovery and requested supplemental briefing. Order of Apr. 3, 2017 [#10]. The parties have now filed their supplemental briefs.

## Analysis

### I. Legal Standard

A preliminary injunction is an extraordinary remedy only issued if the movant establishes:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

However, in an action to enforce a covenant restricting the use of land under Texas law, no showing of irreparable injury is necessary. *See Aufman v. The Gov't of Japan*, No. CIV.A. H-04-3449, 2005 WL 2030844, at *7 (S.D. Tex. Aug. 22, 2005) (first citing *Voice of the Cornerstone Church v. Pizza Prop. Partners*, 160 S.W.3d 657, 668 (Tex. App.—Austin 2005, no pet.) ("A restrictive covenant may be enforced by injunction where a distinct or substantial breach is shown, without regard to the amount of damages caused by the breach."); and then citing *Protestant Episcopal Church Council of the Diocese of Tex. v. McKinney*, 339 S.W.2d 400, 403 (Tex. Civ. App.—Eastland 1960, writ ref'd) (explaining no showing of irreparable injury is necessary to enforce a covenant restricting the use of land)), *aff'd sub nom. Aufman v. Gov't of Japan*, 200 F. App'x 364 (5th Cir. 2006). To enforce a restrictive covenant by injunction, the movant need only show a distinct or substantial breach of a valid restrictive covenant. *Id.*

## II. Application

Deed restrictions are restrictive covenants concerning real property. *See* TEX. PROP.CODE § 202.001(4) (defining restrictive covenant). Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998); *Bank United v. Greenway Improvement Ass'n*, 6 S.W.3d 705, 707 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). As when interpreting any contract, the court's primary duty in construing a restrictive covenant is to ascertain the drafter's intent from the instrument's language. *Bank United*, 6 S.W.3d at 708. In

ascertaining the drafter's intent, the court looks to the covenant as a whole in light of the circumstances present when the covenant was made. *Pilarcik*, 966 S.W.2d at 478.

Here, the Use Restriction and the Condominium Declaration together form the applicable deed restriction. In its entirety,[4] the relevant portion of the Use Restriction provides "the Restricted Property may not be used, operated, or marketed as an Assisted Living Facility (as that term is defined in the Condominium Declaration) or a Memory Care Facility. For avoidance of doubt, the term 'Assisted Living Facility' shall include facilities furnishing services to either a Type A or Type B assisted living facility as such terms are defined in Rule 92.3 of the Texas Administrative Code, Title 40, Part I, Chapter 92." Use Restriction at 1.

And the Condominium Declaration defines Assisted Living Facility to mean a facility that

> (i) furnishes, in one or more buildings, food and shelter to long-term residents of such building(s) and (ii) is licensed as an Assisted Living Facility, if required under applicable state or federal law and regulations, and provides Personal Care Services (as hereinafter defined) to its residents. "Personal Care Services" means (i) assistance with meals, dressing, movement, bathing or other personal needs or maintenance to the residents; (ii) the administration of medication by a person licensed to administer medication or the assistance with or supervision of medication to the residents; or (iii) general supervision or oversight of the physical and mental well being of the residents who need assistance to manage the person's personal life regardless of whether a guardian has been appointed.

Condominium Declaration at 19.

Harbor moves for a preliminary injunction, claiming Lakeway is violating the terms of the Use Restriction. However, Harbor does not object to Lakeway's operation of an independent living facility in the Medical Center. Rather, Harbor claims Lakeway is violating the Use Restriction by marketing and preparing to operate LTIL as an assisted living facility as the term is defined in the Condominium

---

[4] At no point in its briefing did Harbor fully quote the Use Restriction to include the language referencing the Texas Administrative Code and Type A or Type B assisted living facilities. *See* Mot. Prelim. Inj. [#2]; Pl.'s Suppl. Br. [#17].

Declaration. Harbor contends LTIL meets the definition of a *de facto* assisted living because (1) it "will offer food (three chef-prepared meals a day) and shelter (apartments) to long-term residents" and (2) it will provide personal care services, such as assistance with meals, maintenance, and medical services. Mot. Prelim. Inj. [#2] at 5.

Lakeway does not dispute the Use Restriction is valid and prohibits it from operating and marketing LTIL as an assisted living facility. Instead, Lakeway claims it is not marketing or preparing to operate LTIL as an assisted living facility. Although Lakeway does not dispute LTIL will provide food and shelter to long-term residents, Lakeway argues LTIL is not an assisted living facility because it is not licensed as an assisted living facility and will not provide personal care services. Moreover, Lakeway explains LTIL residents can independently arrange and pay for any personal care services they may need from third parties, which Lakeway claims does not violate the Use Restriction.[5]

The Court finds Harbor has not established a likelihood of success on the merits for three key reasons: (1) LTIL does not appear to meet the Condominium Declaration's definition of an assisted living facility; (2) the current record indicates Lakeway will not provide personal care services, and (3) the relief Harbor seeks is broader than would be granted if the Use Restriction were violated. The Court discusses each of these reasons in turn.

---

[5] Lakeway also argues interpreting the Use Restriction to require LTIL residents to be capable of living independently without the assistance of others would violate the Fair Housing Act (FHA). Because the Court finds LTIL likely does not meet the Condominium Declaration's definition of an assisted living facility, the evidence suggests Lakeway is not preparing to provide or marketing itself as providing personal care services, and Harbor's requested relief likely exceeds the scope of the Use Restriction, the Court need not examine whether a theoretical interpretation of the Use Restriction would violate the FHA at this time.

### A. LTIL does not appear to meet the Condominium Declaration's definition of an assisted living facility.

In light of the Texas statutory framework, the language of the Use Restriction and the Condominium Declaration likely prohibits Lakeway's property from being used or marketed as a *licensed* assisted living facility. Because LTIL is not a licensed assisted living facility and neither party argues it should be licensed as such, LTIL does not appear to satisfy the definition of an assisted living facility as articulated in the Condominium Declaration.

To begin with, the Condominium Declaration's definition of assisted living facility is conjunctive rather than disjunctive. *See* Condominium Declaration at 19. Thus, preliminary analysis of the definition suggests a facility is an assisted living facility if it:

(1) furnishes food to long-term residents; and
(2) furnishes shelter to long-term residents; and
(3) is licensed as an assisted living facility, if required under applicable state or federal law and regulations; and
(4) provides personal care services to its residents.

*See id.* Merely satisfying some of these criteria is not enough; an assisted living facility as defined under the Condominium Declaration and prohibited by the Use Restriction must satisfy all four criteria. *See id.*

Harbor argues, in order to give effect to the language "if required under applicable state or federal law and regulations," the Court should find the Use Restriction applies to both licensed and unlicensed assisted living facilities. Mot. Prelim. Inj. [#2] at 12–14. In essence, Harbor argues the Court should find the Use Restriction prohibits other properties in the Medical Unit from being operated or marked as *de facto* assisted living facilities. This argument is unlikely to be successful.

Texas law requires *all* assisted living facilities to be licensed. TEX. HEALTH & SAFETY CODE § 247.021(a), Harbor claims the Condominium Declaration definition of assisted living facility is

broader than the Texas law definition. The Court disagrees. Instead, it appears the category of facilities to which Texas grants assisted living facility licenses is broader than the Condominium Declaration definition.

The Texas law definition and the Condominium Declaration definition of assisted living facility are almost identical, except the Condominium Declaration incorporates language referencing a license "if required by law." *See* Defs.' Suppl. Br. [#16-2] Ex. A (Definition Comparison). Texas law permits facilities not operating as assisted living facility to nevertheless apply for an assisted living facility license and thereby market themselves as an assisted living facility. *See id.* § 247.021(c) ("A person establishing or operating a facility that is not required to be licensed but who elects to obtain a license under this chapter may use the term 'assisted living' in referring to the facility or the services provided at the facility."). Thus, under Texas law, a facility can be licensed as an assisted living facility, even if it is not technically an assisted living facility and is not required to have such a license. Therefore, it seems likely the Condominium Declaration's definition of assisted living facility excludes a facility electing to obtain an optional assisted living facility license but not providing personal care services.[6]

As "Lakeway is not licensed as an assisted living facility, and neither party contends that it should be," there is no evidence to suggest Lakeway has or is preparing to violate the Use Restriction by using, operating, or marketing an assisted living facility as defined in the Condominium Declaration. *See* Mot. Prelim. Inj. [#2] at 12. On this ground alone, the Court could deny Harbor's motion for a preliminary injunction.

---

[6] The Court does not need to explore why a facility may elect to obtain an assisted living license but not market itself as an assisted living facility. It is enough that this possibility exists and valid justification for doing so, such as maintaining an assisted living license for insurance purposes, might exist.

B.  **The record suggests Lakeway is not preparing to provide or marketing itself as providing personal care services.**

Alternatively, even if the Condominium Declaration definition included a *de facto* assisted living facility, there is little evidence to suggest Lakeway is preparing to provide or is marketing itself as providing personal care services.

The Condominium Declaration defines personal services to mean:

> (i) assistance with meals, dressing, movement, bathing or other personal needs or maintenance to the residents; (ii) the administration of medication by a person licensed to administer medication or the assistance with or supervision of medication to the residents; or (iii) general supervision or oversight of the physical and mental well being of the residents who need assistance to manage the person's personal life regardless of whether a guardian has been appointed.

Condominium Decl. at 19.

Harbor claims Lakeway will be indirectly providing assistance with meals, bathing, and medication management by allowing a third-party healthcare provider to lease space at LTIL and by providing twenty-four hour assistance. Mot. Prelim. Inj. [#2] at 15. As evidence for this claim, Harbor cites one secretly-recorded conversation with Ms. Parker, a sales representative who had only been working on Lakeway's behalf for two days before the recorded conversation. *See id.* at 15–17.[7]

By contrast, Lakeway marshals evidence to refute Harbor's claim. In particular, Lakeway supplies the Residency Agreement it will have all residents sign, which states LTIL will not provide staff to care for residents and will not provide skilled nursing services of any kind, such as the services of aids or nurses or assistance with medication. Residency Agreement at 4–6. The Residency Agreement also emphasizes how LTIL will not supervise the activities of residents of the independent

---

[7] Lakeway argues Ms. Parker erred in her representations to Harbor's private investigator because she was a brand new a sales representative for LTIL, had been trained in Colorado, and was an employee of Spectrum, which operates both assisted living and independent living facilities. *See* Olson Aff. at 2; Parker Aff. at 1.

living units. *Id.* Instead, the Residency Agreement reminds LTIL residents they can independently contract with outside service providers to secure any healthcare or other services they may need. *Id.* There is no evidence the Residency Agreement is inaccurate or misleading.

Furthermore, Lakeway states LTIL will not provide twenty-four hour assistance, will not have nurses onsite, and will not employ a medical director. *See* Defs.' Suppl. Br. [#16-3] Ex. B (Lakeway and Harbor Comparison). Additionally, Lakeway cites evidence indicating it will not be leasing space to a third-party healthcare provider, even though it initially considered doing so. *See* Patterson Aff. at 4; *see also* Olson Dep. at 75:23–76:8. Finally, Lakeway also provides evidence showing it informed Harbor no healthcare provider would be leasing space at LTIL before this lawsuit was filed. *See* Timeline at 4; Mar. 27, 2017 Email. There is no evidence to suggest Lakeway's representations are false.

Yet, Harbor also complains Lakeway will be providing personal care services because it advertises Lakeway "take[s] care of everyday chores like cooking, cleaning, laundry, and maintenance" and offers transportation services to medical appointments and the grocery store. Mot. Prelim. Inj. [#2] at 15. Yet, such a complaint ignores the difference between amenities and personal care services. As defined by the Condominium Declaration, personal care services appear to relate to the personal care of the residents themselves, such as help with feeding or bathing oneself, as opposed to amenities a luxury living facility might provide, such as housekeeping or laundry. *See* Condominium Declaration at 19.

In sum, there is insufficient evidence to support the allegation Lakeway is preparing to provide or is marketing itself as providing personal care services.

C.  **Harbor seeks relief broader than would be granted if the Use Restriction were violated.**

Harbor requests a preliminary injunction prohibiting Lakeway from marketing or preparing to provide assistance with personal care services, operating a restaurant on-site, and leasing space to home health providers. Mot. Prelim. Inj. [#2] at 18–19. However, Harbor's requested relief exceeds the scope of relief to which it is likely entitled to under the Use Restriction.

The Use Restriction explicitly prohibits properties other than Harbor's from being "used, operated, or marketed as an Assisted Living Facility . . . ." Use Restriction at 1. On its face, it does not prohibit providing personal care services. If the Use Restriction did preclude properties other than Harbor's from furnishing personal care services, then properties supplying skilled nursing or rehabilitation services might violate the Use Restriction. *See* Sept. 2013 Amendment at 2. Relatedly, no evidence in the record suggests the prohibition on operating or marketing property as an assisted living facility includes a bar on operating a restaurant or leasing space to third-party home health provider.

Consequently, in light of the current record, Harbor's requested relief likely exceeds the relief to which it would be entitled under the Use Restriction.

## Conclusion

For these reasons, the Court finds Harbor has not met its burden to show a substantial likelihood of success on the merits. Thus, the Court DENIES Harbor's motion for a preliminary injunction. In addition, as the Court already granted tailored discovery for the limited purpose of determining if preliminary injunctive relief was merited, Harbor's motion for leave to conduct expedited discovery and motion to compel are DISMISSED. In particular, the motion to compel need not be considered at this time as the parties shall comply with the full scope of their discovery

obligations. Simultaneously with the entry of this order, the Court issues a scheduling order as the delay in entering the preliminary injunction order caused the parties a delay in obtaining a trial date. Accordingly,

IT IS ORDERED that Plaintiff LMV-AL Ventures, LLC d/b/a The Harbor at Lakeway's Motion for a Temporary Restraining Order and Preliminary Injunction [#2] is DENIED;

IT IS FURTHER ORDERED that Plaintiff LMV-AL Ventures, LLC d/b/a The Harbor at Lakeway's Motion for Leave to Conduct Expedited Discovery [#3] is DISMISSED AS MOOT; and

IT IS FINALLY ORDERED that Plaintiff LMV-AL Ventures, LLC d/b/a The Harbor at Lakeway's Motion to Compel [#11] is DISMISSED.

SIGNED this the 30th day of May 2017.

/s/ Sam Sparks
SAM SPARKS
UNITED STATES DISTRICT JUDGE